# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARACELLY TORRES AND SANDY MERCEDES, | : | |
| | : | |
| | : | |
| Plaintiff, | : | K18C-07-012 JJC |
| | : | |
| v. | : | |
| | : | |
| DAVID BISHOP, | : | |
| | : | |
| Defendant. | : | |

Submitted:  October 12, 2021
Decided:  December 21, 2021

## MEMORANDUM OPINION & ORDER

## TRIAL DECISION

Robert Taylor, Esquire, BARROS MACNAMARA MALKIEWICZ AND TAYLOR, Dover, Delaware, *Attorney for the Plaintiffs.*

Arthur Kuhl, Esquire, REGER RIZZO AND DARNALL LLP, Wilmington, Delaware, *Attorney for the Defendant.*

**Clark, J.**

1

This case involves a motor vehicle accident and resulting injuries that occurred on July 25, 2016, in the Walmart parking lot in Camden, Delaware. After considering the witnesses' testimony, the exhibits, and visiting the accident site, the Court provides the following decision after a bench trial.

## Procedural Background

Plaintiffs Aracelly Torres and Sandy Mercedes sued Defendant David H. Bishop for personal injury. Ms. Torres and Mr. Mercedes contend that Mr. Bishop negligently operated his vehicle in a Walmart parking lot, proximately caused an accident, and thereby proximately caused injury to Ms. Torres. Mr. Mercedes sues derivatively for loss of consortium.

The parties originally demanded a jury trial. After completing discovery, they submitted a joint request for a bench trial. When doing so, they stipulated to certain matters to streamline the trial. Their stipulations included: (1) a joint request that the Court visit the Walmart parking lot where the accident occurred; (2) the admissibility of their doctors' expert medical reports; (3) the genuineness and authenticity of all medical records and bills; (4) the admissibility of all property damage photographs; and (5) the parties' agreement to exchange their exhibits prior to trial to avoid duplicative exhibits.

The Court held the trial on October 12, 2021. At the end of the parties' cases--in-chief, the Court visited the parking lot, and then closed the evidentiary record. The parties then provided argument and the Court reserved decision.

## Evidence Presented at Trial

Before the parties presented their witnesses, they offered their respective exhibits which the Court admitted into evidence without objection. They included: photographs of the accident site; photographs of the damage to Ms. Torres' car and

Mr. Bishop's camper;  photographs of the vehicles' final resting places; Ms. Torres' medical records and bills; the parties' medical expert reports; and a certified copy of disposition showing that Mr. Bishop paid a voluntary assessment for inattentive driving.

Ms. Torres testified first and stated the following.  She drove to Walmart during her lunch break on the day of the accident.   Then, after buying groceries, she drove straight to the parking lot's exit.   The exit emptied into Walmart Drive which is the road that encircles the Walmart parking lot.  Ms. Torres intended to cross Walmart Drive to go to the Chick-fil-A located on the other side of the Drive.  Before crossing, she stopped at a stop sign.  As she sat there, in a "split second," a shadow moving on Walmart Drive crossed her line of vision.  She then heard a loud crashing noise.   Contemporaneously, she felt an abrupt force strike her vehicle and cause it to violently shake.  Her left knee then smashed into the driver's side door.  Ms. Torres also testified that she gripped her steering wheel tightly with both hands at impact. At that point, she realized that the left-side of a large camper was striking the front left side of her vehicle.  She stated that because it happened so quickly, she could not estimate how long the collision lasted or the speed of the camper as it struck her.[1]

Mr. Bishop testified that on the day of the accident, he, his wife, and his two-year-old German Shepard were driving from their home in New Jersey to Ocean City, Maryland for vacation.   At the time, he drove a newly purchased pickup truck that towed their new forty-foot camper.   The camper attached to the bed of the truck with a fifth wheel hitch.   Mr. Bishop testified that this type of hitch permitted easier maneuvering of the large camper.  He explained how it permitted the camper to pivot

---

[1] Ms. Torres estimated during a pre-trial deposition that the camper was travelling at 30 to 35 miles per hour.  However, at trial, she stated that she was unable to estimate the camper's speed because the accident happened too quickly.

at sharper angles. Although Mr. Bishop had driven trucks and campers in the past, this was the largest camper he had ever pulled.

The couple had driven for approximately three and a half hours and were heading southbound on U.S. Route 13. Near Camden, their dog became excited and began to whine. Mr. Bishop understood from the dog's actions that it needed to go to the bathroom. At that point, he decided to pull into the Walmart parking lot to let her do so. Although he had never been to that Walmart, he testified that he knew Walmart parking lots were generally "camper-friendly." After he left Route 13, he entered Walmart Drive. He then followed the Drive until he reached a dead end with an adjacent left-side entrance into the parking lot where the accident occurred.

According to Mr. Bishop, he saw no other vehicles at that entrance as he approached it. He further testified that, as he came to a near stop on Walmart Drive, he began to slowly turn into the parking lot. Once inside, he intended to then make an immediate right turn into a side road that led to a grassy area. However, as he made the left turn into the lot, he noticed that the side road was a one-way exit. He then changed course quickly and attempted to pull straight into the parking lot without making the right turn. As his truck entered the lot, he asked his wife if the camper was clearing the curb on the right. She watched outside her passenger's side window and reported in the affirmative. Mr. Bishop then cut the wheel to the left and began to pull the truck forward. Suddenly, he heard a loud crashing noise. Mr. Bishop then testified that he pulled his camper forward several additional feet. That straightened the camper behind his truck. Mr. Bishop contended that he was "barely moving" when he heard the loud sound. He admitted that he never saw Ms. Torres' vehicle until after the collision. After the collision, he saw her vehicle adjacent to the left side of his camper.

Mrs. Bishop corroborated Mr. Bishop's perspective and recollection. As with Mr. Bishop, she did not see Ms. Torres' vehicle at any point before the collision.

4

Rather, she admitted that she was focusing on the right side of the truck as a spotter to make sure the camper could make the turn without hitting the curb.

After the collision, both parties photographed the final resting places of the vehicles. Ms. Torres' vehicle sat just short of the stop line at the edge of Walmart Drive, across from the Chick-fil-A. After the accident, the camper sat almost directly parallel to Ms. Torres' vehicle in the opposite lane of travel. Testimonies from both parties support, as confirmed by the photographs, that there was approximately a foot of space between Ms. Torres' car and Mr. Bishop's camper. Ms. Torres further testified that after she exited her vehicle, she spoke to Mr. Bishop. According to Ms. Torres, Mr. Bishop told her that the dog sat in the front seat with him at the time of the accident and had distracted him.

In addition to taking photographs of the vehicles' final resting places, Ms. Torres and Mr. Bishop separately took photographs of the damage to their vehicles. After they did, Mr. Bishop moved the truck and camper forward into the parking lot because they blocked traffic. Ms. Torres' vehicle remained at its final resting place until a tow truck removed it hours later.

The parties agree that the police did not respond for hours. When Corporal Ciglinsky with the Delaware State Police finally arrived, he took statements from both parties. Corporal Ciglinsky testified that based on their statements, he issued a ticket to Mr. Bishop for inattentive driving. At the beginning of the trial, the parties had stipulated to the admissibility of a certified disposition of charges showing that Mr. Bishop paid the voluntary assessment. Nevertheless, Mr. Bishop objected to Corporal Ciglinsky's testimony that he had issued the ticket because the Trooper was not an accident reconstructionist. The Court overruled the objection. When doing so, it admitted the testimony for the limited purpose of explaining the origin of the ticket that Mr. Bishop later paid by voluntary assessment.

5

Regarding the inattentive driving citation, Mr. Bishop contended that he paid the voluntary assessment as a matter of convenience because it "didn't make sense logistically" for him to travel to Delaware to contest the ticket. While Mr. Bishop admitted he knew there would be consequences to paying the fine, he testified that he did not consider himself to be guilty of the traffic offense.

Corporal Ciglinsky further explained that he prepared an accident report based on the parties' statements and the damage he observed on the vehicles. The report included a diagram that depicted the vehicles' positions at the point of impact. Although neither party sought to admit the entire accident report into evidence, the Court admitted the portion of the report containing Corporal Ciglinsky's diagram without objection.

As to evidence bearing on damages, Ms. Torres testified that she felt no pain immediately after the accident. Accordingly, she sought no medical attention and did not tell Mr. Bishop or Corporal Ciglinsky that she was hurt. However, she testified that the next day she woke up "hurting all over," and made an appointment with her primary care doctor within two to three days. She relayed to the Court that she felt pain in her neck, left shoulder, left arm, left wrist, left hand, left knee, and low back. She testified that she regularly suffered from low back pain prior to the accident, and that the accident aggravated that pain.

Three days after the accident, medical records documented her complaints of left knee, cervical, left shoulder, and lumbar pain. She also complained of pain radiating down her left arm. As a result, her primary care physician prescribed her muscle relaxers and pain medication.

When this medication provided limited relief, Ms. Torres explained that she made an appointment with Bay Health Orthopedics ("Bayhealth"). The medical records at Bayhealth show her first appointment to be August 12, 2016, seventeen

days after the accident. At that appointment, a physician's assistant referred Ms. Torres to physical therapy.

According to her records, she first attended therapy on August 22, 2016. During her first therapy visit, Ms. Torres completed a form entitled "Current Episode of Care." On the form, she circled her areas of injury on a body diagram. Specifically, she circled her low back, neck, left knee, left arm, and left wrist. She also indicated that she had numbness and tingling in her left upper extremity.

While therapy and cortisone injections eventually relieved the pain in Ms. Torres' back, neck, and knee, the numbness, tingling, and burning in her upper left extremity continued. At first, a Bayhealth provider feared that Ms. Torres' radiating pain and tingling stemmed from a cervical injury. Accordingly, he ordered an MRI study that ruled out structural damage to her neck. Next, he ordered an EMG test. That diagnostic study showed that Ms. Torres had carpal tunnel syndrome in her left wrist.

Given this diagnosis, a physician assistant at Bayhealth referred Ms. Torres to Dr. Singh, a hand specialist in the same practice. Dr. Singh confirmed that she suffered from moderate carpal tunnel syndrome of the left wrist. Dr. Singh provided her a steroid injection and prescribed use of a night-time wrist brace. Because her wrist pain and numbness persisted, the doctor performed release surgery in September 2017. Ms. Torres testified, and the records corroborate, that the surgery corrected her carpal tunnel syndrome. However, for the month following the surgery, she could not work. She also had significant physical limitations during that month She explained that because of a congenital condition in her right arm, she had learned to rely heavily on her left arm. Because of the combined limitations in both arms, during her recovery, she was unable to bathe herself, dress herself, brush her teeth, or complete most household tasks. Her husband, Mr. Mercedes,

7

assisted Ms. Torres in her recovery and assumed most of the household duties during that month.

The medical records support that although the surgery relieved the numbness and tingling in her wrist and arm, Ms. Torres continued to suffer aching pain in her left hand. According to the medical records, the pain awoke her frequently. To diagnose the cause of the continued pain, Dr. Singh ordered an MRI of her left wrist in May 2018. The MRI study revealed a tear of her left triangular fibrocartilage complex (hereinafter "TFCC"). He recommended that she use a wrist widget and brace to limit wrist movement. Additionally, he referred her to occupational therapy which she attended. Ms. Torres testified that she followed his instructions but nevertheless continued to experience pain.

Given her continued pain and limitations, Dr. Singh suggested that she undergo a second surgery to repair the TFCC tear. Fearing complications from another surgery, Ms. Torres refused it. She also testified that she would not consider having it in the future. Instead, she has opted for steroid injections, which she has found to provide some relief.

At trial, Ms. Torres testified that as of October 2021, she still feels a dull, constant pain in her left hand. Certain activities, such as scrubbing and sweeping exacerbate her pain. To manage it at home, she uses warm compresses and Bio-Freeze. She also takes over-the-counter anti-inflammatory medication. Although Ms. Torres testified that she intends to never undergo an additional surgery, she remains willing to receive additional steroid injections to help with future pain management.

Finally, before the close of the evidence, the Court travelled to the parking lot where the accident occurred as jointly requested by the parties. When doing so, the Court observed the parking lot's configuration, the intersection where the collision

occurred, and the surrounding access roads. The visit provided helpful context for the Court's liability decision.

**Applicable Standards**

In a bench trial, the Court sits as the finder of fact.[2] In this role, the trial judge must judge the witnesses' credibility and determine what weight to assign their testimony.[3] The Court is "free to accept or reject any or all of the sworn testimony, as long as it consider[s] all of the evidence presented," as does a jury.[4] When the Court cannot harmonize the conflicting testimony, the trial judge must determine which portions of the testimony deserve more weight.[5]

In civil actions such as this one, the burden of proof is by a preponderance of the evidence.[6] This means that the Court must determine if the party that carries the burden of proof on an issue proves that issue to be more likely true than not.[7]

Here, because Ms. Torres and Mr. Mercedes sue in negligence, they bear the burden of proving that (1) Mr. Bishop owed them a duty; (2) he breached that duty; (3) his breach proximately caused Ms. Torres and Mr. Mercedes harm; and (4) the nature and degree of that harm.[8] On the other hand, Mr. Bishop raises comparative negligence as an affirmative defense. As to that issue, Mr. Bishop bears the burden of proof.

---

[2] *Pecander Associated, LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *2 (Del. Super. June 30, 2010).

[3] *Mundy v. Devon*, 906 A.2d 750, 755 (Del. 2006); *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005).

[4] *Pardo v. State*, 160 A.2d 1136, 1150 (Del. 2017).

[5] *Foraker v. Rife*, 2017 WL 1424330, at *2 (Del. Com. Pl. Apr. 3, 2017) (citing *Nat'l Grange Mut. Ins. Co. v. Nelson F. Davis, Jr., et. al.*, 2000 WL 33275030, at *4 (Del. Com. Pl. Feb. 9, 2000)).

[6] *Id.* (citing *Gregory v. Frazer*, 2010 WL 4262030, at *1 (Del. Com. Pl. Oct. 8, 2010)).

[7] *Carey v. Estate of Myers*, 2015 WL 4087056, at *17 (Del. Super. July 1, 2015) (citing *Pecander Associates*, 2010 WL 2681862, at *2), *aff'd*, 132 A.3d 749 (Del. 2016).

[8] *See Hudson v. Old Guard Ins. Co.*, 3 A.3d 246, 250 (Del. 2010).

9

Finally, the Court must remain mindful that in its role as the trier of fact, the analysis of a witness's credibility is not limited to judging the witness's truthfulness.[9] Rather, the credibility of a witness's testimony should also be judged by other factors such as the witness's interest in the outcome of the case, demeanor while testifying, means of knowledge, strength of memory, and opportunity for observation.[10] In this case, all of the witnesses did their best to testify truthfully. Given that recognition, the Court bases its credibility findings in this case primarily upon the competing witnesses' means of knowledge and opportunity for observation.

**Findings of Fact Regarding whether Mr. Bishop's Negligence Proximately Caused the Accident**

After considering the evidence, the Court finds more likely than not that Mr. Bishop's negligent driving proximately caused the accident. It bases this finding upon several factors.

First, those facts that are undisputed support the finding that Mr. Bishop acted negligently. Namely, Mr. Bishop entered a difficult to navigate Walmart access road, with a dead end, that in turn emptied into an equally difficult to navigate parking lot. Mr. Bishop did so with his new, large, pickup truck, that pulled the Bishop's new, large fifth wheel, forty-foot camper. Although Mr. Bishop obviously did not design the parking lot, he nevertheless had the obligation to drive with full time and attention to his task.

In this regard, Mr. Bishop admitted in a prior deposition that while attempting the maneuver, his dog was "going a little nuts." At trial, he testified that she was

---

[9] *See State v. Diggs*, 2019 WL 1752644, at *4 (Del. Super. Apr. 16, 2019), *aff'd*, 257 A.3d 992 (Del. 2021).
[10] *Id.*

10

getting "antsy" and "whining." Ms. Torres also credibly testified that Mr. Bishop told her at the accident scene that his dog distracted him while he sought to find a place to let his dog out of the vehicle. The size of his vehicles, the area in which he attempted to maneuver them, and the distraction caused by the dog are undisputed facts that support the finding that Mr. Bishop drove inattentively at the time of the accident.

Second, Mr. and Mrs. Bishop's admissions regarding Mr. Bishop's attention support the Court's liability finding. In fact, both of the Bishops focused upon the right side of the truck and the camper (the opposite side from that which struck Ms. Torres) at the time of the collision. Together, their testimonies support that Mr. Bishop attempted to make a difficult left turn into the parking lot, while hoping to then make an immediate right turn into what he belatedly learned to be a one-way access road. He admitted that to rectify the situation, he had to quickly "cut the wheel" and abruptly change direction. Similarly, Mrs. Bishop admitted that she maintained her focus on the right side of the truck and camper to make sure they cleared the curb on the right. The Court acknowledges that Mr. Bishop testified that, at one point, he looked through his left-side-rear-view mirror to see how the camper was turning. Mr. Bishop nevertheless never saw Ms. Torres' car sitting stationary *or* moving. Rather, he had "no idea where she came from." Had Mr. Bishop paid full attention to what other vehicles were doing to the left of his camper, he should have seen Ms. Torres' vehicle at some point prior to or during impact.

Third, Ms. Torres testified credibly that she sat at a complete stop, at the stop sign, at the time Mr. Bishop struck her with the camper. While (1) she saw "only a cloud" appear in front of her before impact and (2) she testified incorrectly at a deposition that Mr. Bishop moved thirty to thirty-five miles per hour before impact, she nevertheless had the superior vantage point during impact and immediately after it.

11

Fourth, the final resting place of Ms. Torres' vehicle supports a common-sense inference that, in turn, corroborates Ms. Torres' testimony. Namely, after impact, Ms. Torres' vehicle sat in her proper lane of travel, at the stop sign, behind the stop line. Her car remained oriented toward the Chick-fil-A that was located across Walmart Drive.

Fifth and finally, the Court assigns considerable, though not independently conclusive weight, to the fact that Mr. Bishop paid a voluntary assessment for inattentive driving. The Court recognizes that on one hand, Mr. Bishop's payment of the voluntary assessment does not conclusively establish negligence.[11] On the other hand, Delaware law permits the finder of fact to consider payment of a voluntary assessment as evidence of negligence.[12]

Mr. Bishop testified that he paid the voluntary assessment as a matter of convenience, rather than to acknowledge guilt. The fact that he paid the ticket, nevertheless, supports the fact that he acknowledged his inattentiveness. When the Court considers (1) that Mr. Bishop paid the voluntary assessment, (2) that he admitted at trial what the Court finds to be inattentiveness, (3) that Ms. Torres testified credibly, and (4) that certain undisputed facts support the finding that he was negligent, the Court finds more likely than not that Mr. Bishop's negligence proximately caused the accident.

Finally, the Court does not rely upon the vehicle damage evidence in making its liability finding. The Court will nevertheless discuss it because the parties relied so much upon it. In this regard, the property damage evidence, as presented through vehicle photographs, weighs neutrally on liability issues. Namely, the photographs

---

[11] *See Boyd v. Hammond*, 187 A.2d 413, 416 (Del. 1963).

[12] *Mahani v. Walls*, 2001 WL 1223193, at *3 (Del. Super. Sept. 21, 2001); *see also Merkins v. Nichols*, 1991 WL 18103, at *1 (Del. Super. Feb. 6, 1991) (recognizing that whether a defendant's payment of a voluntary assessment constitutes an admission of guilt is an issue of fact for the trier of fact).

of damage to the vehicles equally supports either party's theory of the case. They show that Ms. Torres' vehicle suffered significant damage to the front left corner and side of her vehicle. This damage rendered the vehicle inoperable, and a tow truck removed it from the scene. The damage to Mr. Bishop's camper was less severe. The photographs depict scrapes and scratches to the body of the camper at an area limited to a few feet in front of the left-rear wheel well.

In closing argument, Mr. Bishop argued that the damage to his camper was inconsistent with Ms. Torres' explanation of how the accident happened. He argued that if Ms. Torres had been stopped at the stop sign when the collision occurred, there would have been a larger area of damage on the body of Mr. Bishop's camper had it struck her. The limited damage, he argued, supports that Ms. Torres likely clipped the side of the camper as she was approaching the stop sign from a parallel access road that ran parallel to Walmart Drive. If that were the case, notwithstanding Mr. Bishop's possible negligence, his actions would not have been a proximate cause of the accident. Mr. Bishop, however, offered no expert testimony to support this theory. Nor did any witness testify that they observed Ms. Torres clip the side of the camper.

In response, Ms. Torres argued that the physical damage demonstrated that Ms. Torres sat stationary at the stop sign when Mr. Bishop began making a wide-left turn into the parking lot. She argued that when Mr. Bishop made his wide-left turn, the camper crossed into Ms. Torres' lane and struck her vehicle. In this regard, the plaintiffs relied upon Mr. Bishop's testimony about how the fifth-wheel hitch permitted the camper to rotate/pivot in a manner that would have limited the damage to the camper because the camper pivoted away from Ms. Torres' vehicle as it completed its turn. Ms. Torres contended that the fifth-wheel hitch and the truck's slight movement forward after the collision, provided a more plausible explanation

13

for the nature of the damage to the camper. As with Mr. Bishop, Ms. Torres also offered no expert testimony to explain her theory.

In the absence of expert testimony, were the Court to base its decision upon the extent and location of the property damage only, both parties' theories would be equally plausible. When zeroing out that evidence, the witnesses' testimony, the final resting places of the vehicles, and Mr. Bishop's payment of the voluntary assessment demonstrate, by a preponderance of the evidence, that Mr. Bishop's inattentiveness proximately caused the accident.

### Findings of Fact Regarding Ms. Torres' Alleged Contributory Negligence

Mr. Bishop raises the affirmative defense of contributory negligence. He contends that Ms. Torres' contributory negligence should either bar her and her husband from recovering or should proportionately reduce their damages.

When a plaintiff is negligent it is termed contributory negligence.[13] To address the legal consequences of a plaintiff's contributory negligence, Delaware has adopted a modified comparative negligence statute.[14] Under this statutory framework, a plaintiff's contributory negligence may either reduce the damages the plaintiff can recover or bar the plaintiff from recovering all together.[15]

To analyze a defendant's claim of contributory negligence, the Court engages in a multi-step analysis. First, it must determine whether the plaintiff was contributorily negligent.[16] If he or she was, that triggers a subsequent comparative

---

[13] Del. P.J.I. Civ. § 5.12 (2000).
[14] *See* 10 *Del. C*. § 8132.
[15] *See* Dan B. Dobbs, Robert E. Keeton & David G. Owen, *Prosser and Keeton on Torts* 473 (5th ed. 1984).
[16] *See Asbestos Litig. Pusey Trial Grp. v. Owens-Corning Fiberglas Corp.*, 669 A.2d 108, 112 (Del. 1995) (noting that pursuant to Delaware's modified comparative negligence statute, a

negligence analysis.[17]  Thus, if the fact-finder concludes that the plaintiff was not negligent, the analysis ends.[18]  On the other hand, if the fact-finder determines that the plaintiff acted negligently in a manner that also proximately caused the harm, the fact-finder  must weigh the plaintiff's proportion of fault against the defendant's proportion of fault.[19]   If the plaintiff is found to be more negligent than the Defendant – i.e., fifty-one percent or more responsible for the resulting injury - her recovery will be barred.[20]  If the fact-finder concludes that the plaintiff was less than 51 percent responsible, her recovery will be reduced in proportion to her percentage of negligence.[21]

Here, Mr. Bishop contends that Ms. Torres breached numerous common law duties, negligently operated her vehicle, and proximately caused the accident.  When weighing the evidence against the required standard for civil liability, the Court's analysis ends at the first step.  Mr. Bishop did not prove that Ms. Torres more likely than not drove negligently in a way that contributed to the accident.

Mr. Bishop suggested in his closing argument that the extent and location of the damage to the camper prove that Ms. Torres caused the accident when she "clipped" Mr. Bishop's camper as she approached the stop sign.   He cites no other evidence in support of his theory of the case.   As described above,  Mr. Bishop provided no expert testimony to support this contention.   Furthermore, neither Mr. Bishop nor Mrs. Bishop testified that they observed Ms. Torres to be at fault.  Rather, they did not see her vehicle until after the accident.  Balanced against their testimony is Ms. Torres' credible testimony that she sat stationary at the stop sign when the

---

Plaintiff's negligence is a "*condition precedent* to a denial or proportionate *reduction*" in damages).

[17] *See id.*

[18] *Id.*

[19] *See Culver v. Bennett*, 588 A.2d 1094, 1098 (Del. 1991).

[20]*Id.*

[21]*Id.*

camper struck her. In this regard, her testimony is consistent with the parties' agreement that Ms. Torres' vehicle's final resting place was in the same place and oriented in the same manner as where she contends her vehicle sat when the camper struck her.

On balance, the trial evidence supports a possibility that Ms. Torres took some negligent action and, in turn, somehow may have contributed to the accident. Such evidence, however, is not of sufficient quantum to support a finding that Ms. Torres more likely than not acted negligently. Accordingly, no analysis regarding a comparative negligence reduction is appropriate in this case.

**Findings of Fact as to Damages**

Because the plaintiffs met their burden as to liability, the Court must next address damages. To succeed in their claim, the plaintiffs must prove that Mr. Bishop's negligent actions proximately caused their injuries.[22] Delaware courts define proximate cause as the "direct cause without which the [injury] would not have occurred."[23] In other words, the evidentiary floor for establishing proximate cause in Delaware requires Ms. Torres and Mr. Mercedes to prove that harm to them would not have occurred but for Mr. Bishop's actions.[24]

Here, Ms. Torres alleges that the accident proximately caused her significant and permanent injuries. Together, the two plaintiffs seek compensatory damages for (1) Ms. Torres' past medical expenses; (2) the wages Ms. Torres lost during her month-long recovery from carpal tunnel surgery; (3) compensation for Ms. Torres' likely future medical care; (4) Ms. Torres' general damages; and (5) Mr. Mercedes'

---

[22] *Spencer v. Goodill*, 17 A.3d 552, 554 (Del. 2011).
[23] *Chudnofsky v. Edwards*, 208 A.2d 516, 518 (Del. 1965).
[24] *Wilmington Country Club v. Cowee*, 747 A.2d 1087, 1097 (Del. 2000).

loss of consortium. Mr. Bishop disputes that his negligence proximately caused any injury to Ms. Torres or Mr. Mercedes.

During Ms. Torres' direct examination, she testified credibly about the state of her health before the accident. She acknowledged her pre-existing chronic back pain and that she regularly took medication for it. Additionally, she identified a 2012 prior surgery on her right knee. She also explained that because of a birth defect in her right arm, she has always relied more heavily on her left arm and hand. Finally, she testified convincingly that she began feeling pain in her neck and left upper extremities only after the accident. The Court believes her testimony that she first felt symptoms in those areas only after the accident.

By stipulation, both parties presented expert medical opinions through their experts' reports. Neither doctor treated Ms. Torres. Dr. Kates performed a plaintiff's medical exam and Dr. Townsend performed a defense medical exam. In their respective reports, both doctors agreed that Ms. Torres suffered from carpal tunnel syndrome and a left TFCC tear. They also agreed that these injuries would likely require ongoing medical care. They disagreed, however, regarding whether the accident caused the injuries.

Dr. Kates opined that the accident proximately caused her injuries. He also opined that she suffers from a moderate permanent impairment to her left hand and wrist that he relates to the accident. In his report, Dr. Kates discussed the mechanism of injury and wrote that Ms. Torres injured her left wrist when gripping the steering wheel tightly during impact. According to Dr. Kates, the force of the impact transferred to her wrists and caused her carpal tunnel syndrome and the TFCC tear. He also cited studies by the American Medical Association to support his

17

conclusion.[25]   He further opined that because Ms. Torres' treating physicians initially believed that her pain stemmed from an injury to her cervical spine, they failed to thoroughly examine her wrist during her initial stages of treatment.  Only when they ruled out a cervical injury by MRI imaging did they differentially diagnose her wrist injuries.  Thus, according to Dr. Kates,  the delay in diagnosing her carpal tunnel syndrome and TFCC tear was not indicative of a lack of injury or lack of causal connection to the accident.   Finally, Dr. Kates offered the opinions that all of Ms. Torres' medical expenses were reasonable, necessary, and related to the accident.

Mr. Bishop's expert, Dr. Townsend, opined that the motor vehicle accident caused none of Ms. Torres' injuries.  His conclusion rests primarily on his opinion that the speed and force of the vehicles at impact were too minor to cause median nerve irritation or compression.   He based this opinion on a review of the photographs showing vehicle damage and deposition testimony.  He further opined that the onset of Ms. Torres' wrist pain did not coincide with the timing of the accident.   For example, he cited an alleged lack of documentation in the medical records demonstrating any specific soreness or pain around the TFCC tear or lateral epicondyle until 2018, approximately two years after the accident.

In closing argument, Mr. Bishop further stressed that Ms. Torres reported no injuries on the day of the accident.  During cross examination Ms. Torres admitted that in the days following the accident, she had no visible cuts, bruises, or scrapes.  Thus, the defense contended that Ms. Torres' injuries were not caused by the force of the accident, but rather existed before the collision.   Mr. Bishop further contended

---

[25] Pl. Ex. E(1), at 10 ("There is strong evidence in the literature, as stated in the AMA Guides to the Evaluation of Disease and Injury Causation, that forceful trauma is a causative factor for carpal tunnel syndrome.").

that Ms. Torres' wrist injuries were more likely the result of her twenty-year paralegal career than the force of the collision.

Under the circumstances of this case, the Court finds Dr. Kates' expert opinion to be the more credible. In his report, Dr. Kates credibly describes the mechanisms of Ms. Torres' carpal tunnel injury and TFCC tear. He likewise credibly related her other injuries to the accident.

In contrast, Dr. Townsend acknowledges that Ms. Torres suffered from carpal tunnel syndrome and still suffers from a left TFCC tear. He agrees with Dr. Kates' opinion regarding the severity of her injuries, and her need for future medical care. His two bases for not relating the injuries to the accident include (1) an allegedly delayed report of symptoms in her left hand, and (2) his predicate opinion that the accident provided "insufficient vector of forces, and speed" to cause her injuries.

As to Dr. Townsend's first reason, the Court finds Ms. Torres' testimony credible in that she had no pain or injury to her left upper extremities before the accident. Furthermore, Ms. Torres had in fact identified left hand and wrist pain early in her treatment – as corroborated in August 2016 by the diagram where she circled her left wrist to demonstrate where she hurt. Furthermore, her primary care records, within days of her accident, recorded left-sided upper extremity numbness and tingling.

Likewise, the Court does not find Dr. Townsend's causation opinion based on his assumptions regarding the force and direction of impact to be persuasive. Dr. Townsend's report provides no support for his (unquantified) estimate regarding the "vectors of forces, " or how those forces made it impossible, or even improbable, that Ms. Torres suffered the injuries she alleges.

On balance, Ms. Torres' credible testimony coupled with Dr. Kates' expert opinion demonstrates more likely than not that her injuries relate to the accident. As a result, after fully considering the evidence, the Court finds that Ms. Torres' left

19

knee injury, the aggravation of injury to her lower back, her cervical treatment, her carpal tunnel injury, and her left TFCC tear, all proximately relate to the accident. The medical bills and lost wages for those conditions is likewise related. As a result, Ms. Torres is entitled to recover $18,318.32 in past medical expenses, $5,111.07 in past lost wages, and $10,675.20 in estimated future medical expenses.

Furthermore, because Ms. Torres relied and continues to rely more heavily on her left upper extremity due to her congenital condition, her carpal tunnel surgery and objectively verifiable TFC tear caused and continue to cause increased limitations when performing activities of daily living. Dr. Kates and Dr. Townsend's reports both directly support these findings with consistent opinions that surgery would be appropriate to correct Ms. Torres' TFCC tear (although she testified that she would never consent to it). Dr. Kates opines that she suffers from a moderate impairment. Based upon Ms. Torres' testimony and more recent medical records, however, the Court finds that she suffers from a mild permanent partial impairment of the left upper extremity related to the accident.

In light of her injuries, both permanent and resolved, the Court awards her $40,000 in general damages for past and future pain and suffering and a mild permanent partial impairment to her left upper extremity. In total, the Court finds for Ms. Torres and against Mr. Bishop in the amount of $74,104.59.

Finally, as to Mr. Mercedes' derivative claim for loss of consortium, he must have proven that: (1) he was married to the person that suffered a physical injury at the time the physical injury occurred; (2) as a result of the physical injury, he was deprived of a benefit which formerly existed in the marriage; and (3) Ms. Torres has

a valid cause of action against the tortfeasor.[26] He has proven each element by a preponderance of the evidence.

Here, Mr. Mercedes claim focused on the effect on him of Ms. Torres' one-month recovery period after her carpal tunnel surgery in September 2017. Following the surgery, the Court finds Ms. Torres to have been significantly limited in her ability to complete the household tasks she typically performed for the family. Mr. Mercedes testified that he had to assume additional responsibilities and duties during that one-month period. After considering the evidence, the Court awards Mr. Mercedes $2,500 for his loss of consortium.

## Conclusion

For the reasons discussed above, the Court finds in favor of Plaintiff Aracelly Torres, and against Defendant David H. Bishop, in the amount of $74,104.59. The Court further finds in favor of Plaintiff Sandy Mercedes and against Defendant David H. Bishop, in the amount of $2,500. Judgement is hereby entered against Defendant David Bishop for those amounts, with costs assessed against Mr. Bishop.

**IT IS SO ORDERED.**

/s/Jeffrey J Clark
Resident Judge

---

[26] *Jones v. Elliot*, 551 A.2d 62, 63 (Del. 1988) (citing *Folk v. York-Shipley, Inc.*, 239 A.2d 236 (Del. 1968)); *Lacy v. G.D. Searle & Co.*, 484 A.2d 527, 532 (Del. Super. 1984) (citing *Stenta v. Leblang*, 185 A.2d 759 (Del. 1962)).